506 A.2d 1384

**COMMONWEALTH of Pennsylvania**

v.

**Alan Leon HELMS, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 29, 1985.

Filed March 27, 1986.

66

68

Lawrence J. Hracho, Reading, for appellant.

Charles M. Guthrie, Jr., Assistant District Attorney, Reading, for Commonwealth, appellee.

Before WICKERSHAM, BECK and HOFFMAN, JJ.

BECK, Judge:

After a hearing on March 1, 1985, the Court of Common Pleas of Berks County ordered the continued commitment of appellant Alan Leon Helms to Wernersville State Hospital for one year of involuntary treatment pursuant to the Mental Health Procedures Act ("Act"), Act of July 9, 1976, P.L. 817, No. 143, as amended, 50 P.S. § 7101 *et seq.* Appellant now contends that the evidence presented at the hearing was insufficient to support the commitment, and that the trial court lacked jurisdiction to issue its order. We disagree, and therefore affirm the order.

On February 25, 1980, appellant attacked his next door neighbor without provocation by beating him on the head with an old rifle. The neighbor died from the injuries he suffered. The court found appellant to be a paranoid schizophrenic, deemed him incompetent to stand trial, and committed him to Farview State Hospital for treatment. After regaining his competence, appellant stood trial on charges of criminal homicide, and was acquitted on January 20, 1982 because of lack of criminal responsibility. *See* 50 P.S. § 7404. Again, the court found appellant to be severely mentally disabled and committed him to Farview State Hospital in accordance with Sections 7304(g)(2) and 7305 of the Act. Appellant was subsequently involuntarily recommitted on three occasions and was ultimately transferred to Wernersville State Hospital in June of 1984, where he now remains.

The most recent petition to recommit the appellant for up to one year of involuntary treatment is made pursuant to Sections 7304 and 7305 of the Act. A mental health review officer ("MHRO") held a hearing on the petition on November 15, 1984, and recommended that the appellant be treated involuntarily for another sixty (60) days. The court then ordered and held a de novo hearing on March 1, 1985. The court subsequently entered its order committing the appellant to Wernersville for a full year. This appeal followed.

■■■■ We will first address appellant's contention that the trial court lacked subject matter jurisdiction and that its order is therefore invalid.[1] Appellant argues that no provision of the Act allows the trial court to review *sua sponte* an MHRO's recommendations. Consequently, he maintains that the court of common pleas has no authority to review an MHRO's certification unless "a person made subject to treatment" petitions the court for such a proceeding in accordance with Section 7109(b) of the Act.[2]

The Act squarely places responsibility for its administration in the courts. *See e.g.* 50 P.S. §§ 7304 and 7305. The underlying legislative policy recognizes that "[s]ince an individual's freedom of choice and liberty are at stake, it is essential that judges remain the decision-maker[s]...." Myers, *Involuntary Civil Commitment of the Mentally Ill: A System in Need of Change*, 29 Vill.L.Rev. 367, 426 (1983–4).

1. Although appellant failed to raise this issue at trial, he has not waived his right to do so on appeal. Objections to subject matter jurisdiction may be made at any stage in the proceedings by the parties or by the court on its own motion. *Commonwealth v. Little*, 455 Pa. 163, 314 A.2d 270 (1974), *aff'd.*, 468 Pa. 13, 359 A.2d 788 (1976).

2. Section 7109(b) provides as follows:
In all cases in which the hearing is conducted by a mental health review officer, *a person made subject to treatment shall have the right to petition the court of common pleas for review of the certification.* A hearing shall be held within 72 hours after the petition is filed unless a continuance is requested by the person's counsel.... (emphasis added).

While the Act provides for MHROs to assist the court, *see* 50 P.S. § 7109(a), such assistance in no way diminishes the authority of the court.[3] This court has previously established that MHROs are functionaries of the court of common pleas:

> [The] mental health review officer is the equivalent of a master; he may make recommendations upon which the court *may* act; he may issue certifications upon which the court *may* respond by thereafter issuing a court order, and *he may serve the judicial system within each county, within limitations, as the court of that county may so designate. However, the mental health review officer is not a judge, or the equivalent of a judge,* of the Court of Common Pleas.

*In Re Chambers*, 282 Pa.Super. 327, 331, 422 A.2d 1140, 1142 (1980) (emphasis added).

The court's authority is underscored by the fact that an MHRO's recommendations for extended involuntary commitment under Sections 7304 and 7305 of the Act are not final appealable orders, and cannot be implemented without an order from the court. *Id.*, 282 Pa.Super. at 331, 422 A.2d at 1142; *see also In re Bishop*, 282 Pa.Super. 67, 422 A.2d 831 (1980) (per curiam). In addition, as the above-quoted passage from *Chambers* indicates, recommendations of MHROs do not bind the court, which may or may not act upon them in issuing its order.

■ Although Section 7109(b) specifically designates a "person made subject to treatment" as entitled to initiate a review, the Act as a whole, and Section 7109(a) in particular, indicate that common pleas court judges have jurisdiction to initiate as well as review legal proceedings relating to commitment:

> *Legal proceedings* concerning extended involuntary emergency treatment under section 303(c), court-ordered involuntary treatment under 304 or 305 or transfer hearings under section 306, *may be conducted by a judge of*

---

**3.** Under Section 7109(a) an MHRO authorized by the court may also conduct involuntary commitment proceedings.

*the court of common pleas or by a mental health review officer authorized by the court to conduct the proceedings.*

50 P.S. § 7109(a) (emphasis added).

Section 7109(a) grants the hearing court broad authority; it places no limits on the court's capacity to conduct "legal proceedings," either in the first instance or upon review of the MHRO's recommendation.

Thus, while Section 7109(b) affords a person ordered to confinement pursuant to an MHRO's decision the opportunity to have the determination reviewed by the court, it does not subtract from the broad authority granted to the court under the Act. Consequently, we hold that the Berks County Court of Common Pleas had jurisdiction to review and refashion the MHRO's recommendation and order the involuntary commitment of the appellant.

Appellant also claims that the trial court's order of commitment was not supported by clear and convincing evidence. Specifically, appellant maintains that the petitioner failed to show that the appellant was a clear and present danger to others and in need of continuing involuntary treatment within the meaning of Sections 7305(a) and 7304(a)(2) of the Act.[4] The function of this court is not to

---

**4.** Sections 7305(a) and 7304(a)(2) provide in pertinent parts:

**§ 7305. Additional periods of court-ordered involuntary treatment**

(a) At the expiration of a period of court-ordered involuntary treatment under section 304(g) or this section, the court may order treatment for an additional period upon the application of the county administrator or the director of the facility in which the person is receiving treatment. *Such order shall be entered upon hearing on findings as required by sections 304(a)* and (b), *and the further finding of a need for continuing involuntary treatment* as shown by conduct during the person's most recent period of court-ordered treatment.

**§ 7304. Court-ordered involuntary treatment not to exceed ninety days**

(a) **Persons for Whom Application May be Made.**

(2) *Where a petition is filed for a person already subject to involuntary treatment, it shall be sufficient to represent,* and upon hearing to reestablish, that the conduct originally required by section 301 in fact occurred, and *that his condition continues to evidence a clear*

find facts, but to determine whether there is evidence in the record to justify the hearing court's findings. *Commonwealth ex rel. Gibson v. DiGiacinto*, 497 Pa.Super. 66, 439 A.2d 105 (1981). We conclude that appellant's position is unsupported by the record, and is based on a misinterpretation of the dictates of the statute.

Under the Act, in order for an individual to be involuntarily recommitted the petitioner must show by clear and convincing evidence that the individual continues to pose a "clear and present danger" of harm to himself or to others. *See* 50 P.S. §§ 7304(a) and (f).

■ According to the last sentence of Section 7301(b)(1), "clear and present danger" to others *may* be demonstrated as follows:[5]

[A] clear and present danger of harm to others *may* be demonstrated by proof that *the person has made threats of harm and has committed acts* in furtherance of the threat to commit harm.

50 P.S. § 7301(b)(1) (emphasis added).

We emphasize that the Act does not require "threats of harm" and commission of "acts in furtherance of the threat to commit harm" as a condition precedent for finding "clear and present danger." Rather, the Act specifies that the "threats and acts" formula *may*, not must, be used to demonstrate dangerousness.[6] Since the statutory language

*and present danger to himself or others.* In such event, it shall not be necessary to show the reoccurrence of dangerous conduct, either harmful or debilitating, within the past 30 days.
(emphasis added).

5. The lower court based its decision to recommit the appellant on evidence of his continuing dangerousness to others. We therefore do not construe the statute's requirements for a showing of dangerousness to self under Section 7301(b)(2).

6. We note that the Legislature did not hesitate to use the word "shall" in the Act's parallel definition of clear and present danger to self: "... *shall* be established by proof that the person has made threats to commit mutilation...." *See* 50 Pa.C.S.A. § 7301(b)(2)(iii). Clearly, the Legislature intended to distinguish the elements of proof required for each provision. *See e.g. Matter of Columbia Borough*, 24 Pa. Cmwlth. 190, 193, 354 A.2d 277, 280 (1976).

does not dictate that a petitioner use only "threats and acts" to show "clear and present danger," we conclude that other means can also be used.

While the language in the last sentence of Section 7301(b)(1) quoted above relating to "clear and present danger" and "threats and acts" refers generally to all individuals who are candidates for involuntary treatment, the Act also contains an alternative method for showing clear and present danger which applies specifically to insanity acquittees who are the subjects of petitions for involuntary commitment:[7]

> If, however, the person has been ... acquitted by reason of lack of criminal responsibility ... clear and present danger to others may be shown by establishing that the conduct charged in the criminal proceeding did occur, and that there is a reasonable probability that such conduct will be repeated.

50 P.S. § 7301(b)(1).

■ Thus, when the individual is an insanity acquittee, the petitioner can either establish that the individual is a clear and present danger under the standards discussed above which relate to all involuntary commitments, or in the alternative, the petitioner need only show that: (1) the conduct that led to the criminal proceedings occurred; and (2) that there is a reasonable probability that it will occur again. Under this alternate formula, a petitioner need not prove that an insanity acquittee who had been charged with criminal homicide will actually kill again. It is sufficient to show a reasonable probability that some form of violent conduct will occur.

In this case we are asked to construe for the first time the meaning of the statutory phrase "reasonable probability." Specifically, we must consider the Act's requirement for establishing that there is a "reasonable probability" that

7. Persons who have been acquitted because of lack of criminal responsibility, or insanity acquittees, may be involuntarily committed under Section 7406 of the Act. 50 P.S. § 7406.

the conduct which gave rise to an insanity acquittee's involvement in criminal proceedings will recur.

We note that the purpose of the Act and the constitutional concerns it was meant to address indicate that reasonable probability cannot be equated with absolute certainty. Involuntary civil commitment of the mentally ill unquestionably constitutes a deprivation of liberty and may be accomplished only in accordance with due process protections. *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *In re Hutchinson*, 500 Pa. 152, 454 A.2d 1008 (1982). Accordingly, the petitioner in an involuntary commitment proceeding must prove the requisite statutory grounds by clear and convincing evidence. 50 P.S. § 7304(f), *construed in Commonwealth v. Hubert*, 494 Pa. 148, 430 A.2d 1160 (1981).

Nonetheless, under the Act the individual's liberty interests are not absolute. Rather, the Act attempts to strike a balance between the state's valid interest in imposing and providing mental health treatment and the individual patient's rights. *Hutchinson*, 500 Pa. at 156, 454 A.2d at 1010. As the Legislature itself stated:

> The provisions of this act shall be interpreted in conformity with the principles of due process to make ... involuntary treatment available where the need is great and its absence could result in serious harm to the mentally ill person or to others.

50 P.S. § 7102.

The state must confine a mentally ill person who is dangerous to others in order to protect the welfare of the community. *See Hutchinson*, 500 Pa. at 157, 454 A.2d at 1011; *see also Jones v. United States*, 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983) (stating that "the purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual ... and to protect ... society from his potential dangerousness").

Because of the need to balance the interests of the individual with those of the public, the Legislature did not,

as appellant claims, mandate specific guidelines to meet, or demand proof beyond a reasonable doubt that an insanity acquittee would act dangerously again. Instead, the statute requires a "reasonable probability" of repetition. The term "reasonable" underscores the impossibility of demanding total accuracy in predictions of future dangerousness. As the Supreme Court stated in establishing the "clear and convincing" standard of proof for involuntary treatment:

> Whether the individual is mentally ill and dangerous to ... others ... turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists....
>
> *The subtleties and nuances of psychiatric diagnosis render certainties beyond reach in most situations....* Within the medical discipline, the traditional standard ... is a "reasonable medical certainty...." [The] "beyond a reasonable doubt" standard would forc[e] reject[ion] [of] commitment for many patients desperately in need of institutionalized psychiatric care.

*Addington,* 441 U.S. at 429–30, 99 S.Ct. at 1811, 60 L.Ed.2d at 333–4 (citations omitted) (emphasis added).

Although the legislature did not require indisputable proof that an insanity acquittee's dangerous behavior would be repeated, it did prescribe the "probability" of such an event. "Probability" denotes "a chance stronger than possibility but falling short of certainty." *Webster's New World Dictionary, College Edition* (1966). The petitioner must therefore present evidence demonstrating a substantial likelihood that an insanity acquittee will act violently if he is not involuntarily committed. Mere speculation or conjecture that the individual could conceivably harm someone does not constitute a reasonable probability that aggressive conduct will recur.

■ We now examine the record to determine whether the facts adequately support the trial court's finding of a reasonable probability that appellant would again inflict harm on others if he were not recommitted. The record clearly justifies the trial court's finding. The witnesses at

the hearing on March 1, 1985 consisted of three psychiatrists. All agreed that the appellant continued to suffer from schizophrenia, the same mental illness with which he was afflicted when he killed his neighbor. (Record at 14a, 44a, 56a). The prior conduct of one who is mentally ill may be an indicator of future behavior. *See e.g.* Rabkin, *Criminal Behavior of Discharged Mental Patients: A Critical Appraisal of the Research,* Psychol.Bull. 86(1): 1–27 (1979); Slovenko, *Disposition of the Insanity Acquittee,* 11 J. Psychiatry & L. 97, 102 (1983). Appellant's involvement in such an extreme form of violence, while not dispositive, is one factor the hearing judge may consider in his evaluation of the appellant's continued dangerousness.

■ The record also reveals that the appellant intimidated other patients on several occasions during his most recent commitment period. (Record at 26a, 30a). We note that in the recommitment setting, the statute provides that "it shall not be necessary to show the reoccurrence of dangerous conduct, either harmful or debilitating, within the past 30 days." 50 P.S. § 7304(a)(2) (emphasis added); *see also In re S.O.,* 342 Pa.Super. 215, 492 A.2d 727 (1985) (proof of recurrence of violent behavior unnecessary for recommitment). Therefore, the lack of recent evidence of actual violent conduct would not negate a finding of clear and present danger and should be viewed in light of the fact that appellant has been confined to a mental hospital since the killing occurred.

In addition, and more importantly, the testimony elicited at the hearing presented a picture of appellant as a highly volatile individual who is able to maintain control only with the help of anti-psychotic medication and the structured environment of the hospital. (Record at 19a, 44a–47a). The record indicates that appellant loses control and experiences fluctuations in his condition. (Record at 49a). The anti-psychotic drug, Navane, that appellant takes every day has been effective in treating his aggressive symptoms. (Record at 16a, 49a). It is well-documented that without anti-psychotic medication, a schizophrenic's risk of relapse

into a psychotic state is greatly increased. *See e.g.* Davis, *Overview: Maintenance Therapy in Psychiatry: Schizophrenia,* Am.J. Psychiatry 132: 1237 (1975).

The highly structured setting at Wernersville State Hospital is also an important source of stability for the appellant. Two psychiatrists testified to appellant's lack of "inner controls" and his need "to follow authority." (Record at 46a, 27a). In their expert opinion, the psychiatrists stated that without the external constraints of the hospital, appellant would likely forego his medication and abuse alcohol. (Record at 21a, 46a). He would therefore be likely to react with violence to the stresses of everyday life. *See e.g.* Sosowsky, *Crime and Violence Among Mental Patients Reconsidered in Light of the New Legal Relationship Between the State and the Mentally Ill,* Am.J. Psychiatry 135:1 (1978) (noting the high incidence of violent crimes among the deinstitutionalized mentally ill).

■ We conclude that the record demonstrates by clear and convincing evidence the reasonable probability that the appellant would, without further involuntary treatment, behave violently again. Consequently, we affirm the trial court's adjudication that the appellant continued to pose a clear and present danger.

■ The foregoing discussion also addresses appellant's contention that his conduct during his most recent period of court-ordered commitment did not support the trial court's finding of his need for continuing involuntary treatment. Appellant confuses Section 7305's mandate that *his* need for treatment be shown, with Section 7304's requirement of proof of his dangerousness *to others* that has already been discussed. The two issues are separate. Section 7305(a) clearly does not, as appellant maintains, specify that proof of dangerous acts must be presented in order to show appellant's need for additional treatment:

> [An] order shall be entered upon hearing on findings [of continued dangerousness] as required by sectio[n] 304(a) ... *and the further finding of a need for continuing*

*involuntary treatment as shown by conduct* during the person's most recent period of court-ordered treatment. 50 P.S. § 7305(a) (emphasis added); *see In re S.O.,* 342 Pa.Super. at 232, 492 A.2d at 736.

Appellant's need for continued involuntary treatment is evidenced by the numerous symptoms of schizophrenia he exhibited to the three psychiatrists who testified at the hearing. His condition was described as "unstable" and varying "from week to week" even in the structured setting of the hospital. (Record at 46a). All three psychiatrists were of the opinion that the appellant should not be released to outpatient care. (Record at 20a, 47a, 62a–63a).

We conclude that the record supports the trial court's determination that the appellant, as a result of his mental illness, represents a clear and present danger to others, and that his conduct during his most recent period of court-ordered commitment demonstrates his continuing need for involuntary treatment. Neither society nor the appellant himself would benefit from his release.

Accordingly, we affirm the trial court's order.