J-S07041-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KI JON HAN | |
| Appellant | No. 1169 MDA 2014 |

Appeal from the Order Entered June 11, 2014
In the Court of Common Pleas of Berks County
Criminal Division at No(s): CP-06-CR-0000378-1996

BEFORE: BENDER, P.J.E., OLSON, J., and OTT, J.

MEMORANDUM BY OTT, J.:                               **FILED APRIL 10, 2015**

Ki Jon Han appeals the order entered June 11, 2014, in the Court of Common Pleas of Berks County, recommitting him to Wernersville State Hospital (WSH) for a period of one year, subject to conditions for a less restrictive alterative being met, pursuant to the Mental Health Procedures Act (MHPA), Section 304(g)(ii). We affirm based upon on the trial court's sound opinion.

The trial court aptly summarized the facts and procedural history in its Pa.R.A.P. 1925(a) opinion and there is no need to repeat the entire background of this case. *See* Trial Court Opinion, 8/20/2014, at 1–5. Briefly, Han murdered his wife in 1995, and was found not guilty by reason of insanity in a non-jury trial in 1997. Han was committed to Norristown State Hospital for involuntary inpatient treatment, and was transferred to

WSH in 2007, where he has been recommitted on an annual basis ever since.

Han contends the evidence presented at the recommitment hearing held on June 11, 2014, was insufficient to support the decision to recommit him. *See* Han's Brief at 5. The Honorable Linda K.M. Ludgate has provided a thorough, well-reasoned discussion in support of her decision. *See* Trial Court Opinion, *supra*, at 5–13 (finding: (1) the proceedings in this case are governed by the MHPA, 50 P.S. §§ 7304 and 7305; (2) the reports of Stephen Burkholder, M.D., Staff Psychiatrist at WSH, and Larry Rotenberg, M.D., a forensic psychiatrist from the Reading Hospital and Medical Center, were admitted without objection; (3) Dr. Burkholder's report (a) stated Han's diagnosis as Schizophrenia, undifferentiated type, chronic, (b) listed Han's problems/needs, (c) indicated Han continues to require inpatient hospitalization, though discharge to the community is planned, and (d) noted the Treatment Team will continue to explore various discharge options in coordination and communication with the Court; (4) Dr. Rothenberg testified as to his findings, told the court Han was in remission, and opined to a reasonable degree of medical certainty that Han should remain committed to WSH until such time as a transition can be made in the manner described in his report; (5) Han did not present any expert testimony to refute Dr. Rotenberg's expert medical opinion; (6) there is clear and convincing evidence that without the structure of the hospital setting, there is a reasonable probability that Han will again become psychotic and

pose a danger to himself or others; (7) Dr. Rotenberg outlined the only safe way for Han to be released from WSH, which would be to a half-way house or long-term residential facility, very slowly, allowing him to return to WSH, his safe haven, after each outing to keep him in remission; (8) It is in Han's best interest, and therefore the community's best interest, for the doctors to investigate options and cautiously implement Han's transition to a long-term residential treatment placement over the next year, if possible.) Accordingly, we adopt the decision of the trial court as dispositive of the issue raised in this appeal.[1]

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/10/2015

---

[1] In the event of further proceedings the parties are directed to attach a copy of the Trial Court Opinion, 8/20/2014, to this decision.

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS OF
: BERKS COUNTY, PENNSYLVANIA
vs. : CRIMINAL DIVISION
:
KI JON HAN, : No. CP-06-CR-00000378-1996
Defendant : Superior Court No. 1169 MDA 2014

John T. Adams, Esquire, District Attorney
Rourke T. Aston, Esquire, Assistant Public Defender

**MEMORANDUM OPINION, Ludgate, S.J.**                    August 20 , 2014.

Before the court is the appeal of Ki Jon Han (Appellant) from the Order of June 11, 2014, that recommitted him to the Wernersville State Hospital (WSH) for a period of one year, subject to the conditions for a less restrictive alternative being met, pursuant to the **Mental Health Procedures Act (MHPA), Section 304(g)(ii).**

This case involves Appellant's tragic murder of Hwa Ok Han, a 42 year old Korean and wife and mother of his two children. On the evening of September 5, 1995, Appellant reported that he was praying to God, when he said, all of a sudden, there were warning signs from God of what he must do or not do. He did not understand the warnings at first because he was speaking in tongues, but when he asked God what it meant, he said it came to him in his native language of Korean. He claimed God told him these restrictions: do not send the children to school, have his wife teach them, and do not turn the lights on after a certain time. He wrote the restrictions down on a yellow notepad; then he put the children to bed. Appellant and his wife went upstairs to the bedroom where he prepared clothing for them to "go to heaven." They changed into church clothes and then his wife turned on a light in the bathroom, which Appellant saw as a warning sign from the devil not to do that. They went into the living room together to pray, and he turned on the light. He said his wife brought in a songbook and wanted to sing, but he told her not to do that either. Appellant reported that she became angry and

1

went into the kitchen and turned on the light. He claimed that, at this point, something happened and suddenly he had no control over himself. He began hitting his wife with a stick, and then with a kitchen chair. His daughter reported that he was saying that the devil was in his wife and it had to be beaten out. Appellant recalled hearing the voice telling him to chase the devil from his wife. He heard voices coming from her and thought there were three or five devils in her. Appellant reported that he thought, when a person has too many devils in them, you have to get them out. At first Appellant thought it was God talking to him but he later said he realized it was the devil speaking to him.

After the beating, Appellant asked the voice what he should do and he said he was told to put his wife's body in their bed, cover her and then call the police. When the police arrived, Appellant told them that he had killed his wife and that now he must kill himself. The police located the body of the victim in a bedroom at 2229 Reading Blvd., Spring Township, Berks County, Pennsylvania, at 6:46 am. Appellant was taken into custody. Ultimately, Appellant was found Not Guilty by Reason of Insanity and committed to Norristown State Hospital for involuntary inpatient treatment. He was transferred to WSH in July of 2007. He has been recommitted on an annual basis ever since.

## I.  PROCEDURAL HISTORY

A bail hearing was held on September 6, 1995, and bail was set at $750,000 because of the nature of the charges. Appellant remained in the Berks County Prison; he was transported for examinations by a psychiatrist and a physician. A preliminary hearing was held before District Justice Richard Beck on February 6, 1996, and the case was bound over for court.

2

Emmanuel Dimitriou, Esquire, now deceased, entered his appearance on behalf of Appellant on February 27, 1996, and, on that date, Appellant was arraigned on the charges of **Murder of the First Degree, in violation of 18 Pa.C.S. § 2502(a); Murder of the Third Degree, in violation of 18 Pa.C.S. § 2502(c);** two counts of **Aggravated Assault, in violation of 18 Pa.C.S. § 2502(a)(1) & (a)(4);** and **Possessing Instruments of Crime, in violation of 18 Pa.C.S. § 907(a).** After being given an extension of time, counsel for Appellant filed an Omnibus PreTrial Motion on April 10, 1996. The pretrial motion was subsequently amended to include a Motion for Court Determination of Defendant's Competency and PreTrial Determination of Sanity. A pretrial hearing was set for April 24, 1996, but continued to May 15, 1996. The hearing was again continued to July 24, 1996 in order to have psychiatric exams and reports/opinions completed. The matter was then continued generally, pending the outcome of the John E DuPont, on behalf of himself and all those similarly situated in the Commonwealth of PA vs. The Court of Common Pleas of Delaware County and All Courts of Common Pleas in the Commonwealth of PA case before the Supreme Court of Pennsylvania, concerning the competency standard to be applied in these types of cases. At a status hearing on October 24, 1996, Appellant, through counsel, withdrew his portion of the Omnibus PreTrial Motion dealing with his competency based on the report of Dr. Larry A. Rotenberg, a forensic psychiatrist, dated October 10, 1996, indicating that Dr. Rotenberg found Appellant competent to stand trial.

On January 14, 1997, the Motion for Determination of Competency and Criminal Responsibility was refiled after Appellant had several more delusional episodes and was unresponsive during an evaluation by the Commonwealth's psychiatric experts. It was

3

scheduled for hearing on February 18, 1997, but was deferred when, on January 16, 1997, the Commonwealth and Appellant entered into a stipulation that a M'Naghten Hearing be held on March 26, 1997, at which time Commonwealth and defense psychiatric experts would present testimony. In lieu of this hearing, on March 25, 1997, the Court ordered counsel to file extensive written motions setting forth the relief requested and written responses. On April 18, 1997, a trial was set for April 28, 1997. Appellant waived his right to a jury trial and the matter proceeded as a bench trial before the undersigned. After taking testimony and reviewing the exhibits, the Court entered a verdict of Not Guilty by Reason of Insanity. Also on April 28, 1997, the Court ordered Appellant involuntarily committed for one year to confinement in a secure mental health treatment facility, pursuant to 50 P.S. §7304(g)(ii) of the Mental Health Procedures Act. Annually thereafter, mental health review hearings have been held before the undersigned, and Appellant has been recommitted each subsequent year.

The most recent review hearing was held on June 11, 2014. Appellant was recommitted for treatment an additional year, or until such time as an acceptable alternate facility and conditional discharge plan could be arranged. The Order states, in pertinent part, as follows:

> "AND NOW, this 11th day of June, 2014, a hearing having been held on this date, and the Court having had admitted a report from Dr. Burkholder, a staff psychiatrist at Wernersville State Hospital, as well as from Dr. Rotenberg, a forensic psychiatrist at Reading Hospital and Medical Center, and those reports having been reviewed, as well as Dr. Rotenberg having appeared and testified, the Court determines under the Mental Health Procedures Act 304 (g)(ii) that Ki Jon Han shall remain in Wernersville State Hospital for a period of one year until June 11, 2015, the psychiatrist in the report as well as Dr. Rotenberg having determined that he is not yet well enough to be released into the community, the Court also being aware that Mr. Han's religious views played a significant role in the murder of his wife making the Court concerned that his religion could be a façade.

4

In addition, the Court finds that should Wernersville State Hospital obtain an acceptable facility, and Wernersville State Hospital having developed a plan consistent with the report of Dr. Rotenberg dated June 2, 2014, the hospital shall notify this Court so that a hearing could be held to determine if the Court finds it acceptable."

Order, 6/11/14.

The Order also provided for another review hearing to be held in one year if there is no hearing set in the interim under the terms of the Order.

On July 11, 2014, Appellant, through counsel, filed a Notice of Appeal to the Superior Court from this Order. On July 16, 2014, the Court ordered Appellant to file a concise statement of the errors complained of on appeal, which he filed on July 29, 2014.

In his concise statement, Appellant asserts:

"The evidence presented at the Recommitment Hearing held in this matter on June 11, 2014 was insufficient to support recommitting the Defendant for a period of one year pursuant to 50 P.S. §§ 7304 and 7305."

## II.   LEGAL ANALYSIS

The proceedings in this case are governed by the Mental Health Procedures Act, under Section 7304(g), which states:

> **(g) Duration of Court-ordered Involuntary Treatment.**--(1) A person may be made subject to court-ordered involuntary treatment under this section for a period not to exceed 90 days, excepting only that: Persons may be made subject to court-ordered involuntary treatment under this section for a period not to exceed one year if the person meets the criteria established by clause (2).
> (2) A person may be subject to court-ordered involuntary treatment for a period not to exceed one year if:
> (i) severe mental disability is based on acts giving rise to the following charges under the Pennsylvania Crimes Code: murder (§ 2502); voluntary manslaughter (§ 2503); aggravated assault (§ 2702); kidnapping (§ 2901); rape (§ 3121(1) and (2)); involuntary deviate sexual intercourse (§ 3123(1) and (2)); arson (§ 3301); and
> (ii) a finding of incompetency to be tried or a verdict of acquittal because of lack of criminal responsibility has been entered.

5

50 P.S. § 7304(g).

Section 7305 of the MHPA provides for recommitment after a review hearing is held to reassess the requirements of 7304(a)(1)(a person is severely mentally disabled and in need of treatment). Section 7305(a) specifically provides:

**7305. Additional periods of court-ordered involuntary treatment.**

> (a) At the expiration of a period of court-ordered involuntary treatment under section 304(g) or this section, the court may order treatment for an additional period upon the application of the county administrator or the director of the facility in which the person is receiving treatment. Such order shall be entered upon hearing on findings as required by sections 304(a) and (b), and the further finding of a need for continuing involuntary treatment as shown by conduct during the person's most recent period of court-ordered treatment. The additional period of involuntary treatment shall not exceed 180 days; provided that persons meeting the criteria of section 304(g)(2) may be subject to an additional period of up to one year of involuntary treatment. A person found dangerous to himself under section 301(b)(2)(i), (ii) or (iii) shall be subject to an additional period of involuntary full-time inpatient treatment only if he has first been released to a less restrictive alternative. This limitation shall not apply where, upon application made by the county administrator or facility director, it is determined by a judge or mental health review officer that such release would not be in the person's best interest.

50 P.S. 7305(a).

By the clear dictates of the MHPA, in order for an individual to be involuntarily recommitted, a finding of mental disability is required at every annual recommitment hearing. **In Re R.G.** 11 A.3d 513, 518 (Pa.Super.2010). In addition, the petitioner must also show, by clear and convincing evidence, that the individual continues to pose a "clear and present danger" of harm to himself or others. **50 P.S. § 7304(a), (f).** It should be noted that the standard of conduct needed to continue a person's commitment is less than the standard of conduct required for the initial commitment. Section 7304(a)(2) provides:

> (2) Where a petition is filed for a person already subject to involuntary

6

treatment, it shall be sufficient to present, and upon hearing to reestablish, that the conduct originally required by section 301 in fact occurred, and that his condition continues to evidence a clear and present danger to himself or others. In such event, it shall not be necessary to show the reoccurrence of dangerous conduct, either harmful or debilitating, within the past 30 days.

**50 P.S. § 7304(a)(2).**

A petition was submitted to this Court by Service Access Management, Inc., asserting that Appellant had been examined by Dr. Arzoo Habib of WSH, who found that Appellant, a patient receiving involuntary treatment under Section 304(g)(ii), is severely mentally disabled and in need of inpatient treatment. The petition states that the patient "is currently on 304 g ii level care and requires structured supervisory care." Appellant was examined on May 23, 2014 and the results of the examination were listed as follows:

"Ki Jon Han is a 66 year old male with a diagnosis of chronic Schizophrenia, undifferentiated type, who was admitted to Wernersville State Hospital from Norristown State Hospital on July 7, 2007. He has poor insight into his illness. He keeps his emotion suppressed. He is religiously preoccupied. He needs a highly structured supervised setting to maintain mental health stability."

At the review hearing on June 11, 2014, the reports of Dr. Stephen Burkholder, M.D., Staff Psychiatrist at WSH, and Dr. Larry A. Rotenberg, a forensic psychiatrist from the Reading Hospital and Medical Center, were entered without objection. Dr. Burkholder reported Appellant's diagnosis as Schizophrenia, undifferentiated type, chronic. He reported Appellant's problems/needs list as follows: 1) History of psychosis; 2) Legal issues; 3) Denial of mental illness/poor insight; and 4) Development of an appropriate discharge plan in light of 304gii status. Appellant is only taking olanzapine at bedtime to control his symptoms. Dr. Burkholder reported that Appellant continues to require inpatient hospitalization, though discharge to community rehabilitation is planned; he is to continue to participate in group and individual therapy. Dr. Burkholder

7

noted that the Treatment Team will continue to explore various discharge options in coordination and communication with the Court. Court Exhibit 1.

Dr. Rotenberg testified as to his findings and told the Court that Appellant is in remission now, but that no one should be fooled by his superficial façade of courtliness and religiosity, religious preoccupation. Notes of Testimony, 6/11/14, at 8. He continued, "...underneath that façade there still lurks the possibility of a resurgent and delusional disorder and all that goes with it." Id. Dr. Rotenberg noted that, "what should be taken into account is the fact that part of how good [Appellant] looks is the fact that he's at Wernersville which has been his home for so long..." Id.

Dr. Rotenberg cautioned the court:

> "...he must never be treated as an ordinary patient. Not because of the possibilities of the future, but because of the realities of the past. Because in addition to the fact that he killed his wife and as a result of that he is totally isolated from his own culture, and, frankly, part of the concern about him is that in spite of the fact that he is a fairly intelligent individual, he has had English lessons in high school and in college in Korea, and, of course, he's lived in this country for 30 years, 30 years, more than 30 years, and so the fact that given his normal intelligence he has learned so little English in the course of more than three decades is a measure of his...lack of a culturalization. And so that's, of course, a factor, and I go into it in much more detail in my report about his difficulty in relating to other people, and what is of more concern is that he is totally isolated from his own family. His brother who's a distinguished radiologist in the Philadelphia area and who actually supported him during the trial and was here and whom I met totally alienated himself from him. His children are totally alienated from him. They have never had a Christmas card, a birthday card, an e-mail, nothing, no communication."

Id. at 12.

Dr. Rotenberg also noted that, should Appellant go to a halfway house in Philadelphia, which has a large Korean community, he would be immediately ostracized once they found out about Appellant's history. Id. at 13. WSH is the only home that Appellant has known for years and Dr. Rotenberg opined that "taking him out of that

8

home and putting him into another strange home has to be done with the utmost caution both for him and for the community." Id. Dr. Rotenberg opined, to a reasonable degree of medical certainty, that Appellant should remain committed to Wernersville State Hospital until such time as a transition is made in the manner described in his report, in pertinent part:

- "I believe that discharging [Appellant] from WSH should take place over a year, and it should be done in stages which are discreet, and which are very tightly monitored. And I believe that should any regression occur on the part of [Appellant], any consideration for his discharge should be laid aside, and he should be kept in the hospital.
- And so, within the next year, much detailed work needs to be done in order to consider placement of him in the community. First of all, there needs to be established a halfway house, which given his history, is willing to take him.
- Once that is established, he should make several day visits to that place, and this should be monitored closely both by the staff of WSH and the staff at the halfway house.
- If the initial introduction works out satisfactorily, then he can be allowed to go to the halfway house to stay for as long as a week and each time coming back to WSH at the end of that time.
- If all of that works out over a period of about a year, and [Appellant] makes the transition successfully, then he can be discharged to the halfway house.
- Even if the transition is successful, and he makes the change from WSH to a halfway house, he should be retained on an outpatient commitment, so that if any kind of concern is expressed, he can then be returned to the State Hospital as expeditiously as possible, with the least hindrance.
- The most important issue with [Appellant] is that he must never be allowed to go underneath the radar, and to disappear from close follow-up, and preferably, from Court supervision.
- No one should be fooled by [Appellant's] superficial façade of courtliness, and religiosity.
- Underneath that façade, there certainly still lurks the possibility of a resurgent delusional disorder and all that goes with it.
- [Appellant] cannot be ever considered as a regular routine follow-up patient.

Id. at 14; Court Exhibit 2, at 6-7.

Dr. Rotenberg stated in his report that this transition must be done "with the utmost care, and the utmost vigilance." Court Exhibit 2, at 7.

The fact that Appellant's schizophrenia/psychosis is in remission does not mean

9

that Appellant has been cured. Dr. Rotenberg informed the court that, just like a cancer that is in remission, the psychosis can come back. Appellant still has a mental disability with delusional ideas; he requires a highly structured supervised setting to remain in remission. Appellant has not presented us with any expert testimony to refute Dr. Rotenberg's expert medical opinion.

Appellant asserts that the evidence was insufficient to support recommitting him for a year. Counsel argued at the hearing that the burden to recommit includes acts that occurred in the past 30 days that show Appellant is a danger to himself or others. This argument is directly in contradiction to § 7304(a)(2) and established caselaw. The MHPA requires two elements, as discussed in **Foucha v. Louisiana, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992),** to be established: a current mental disability and a determination of dangerousness. *See* In Re R.G., *supra,* at 519. "Clear and present danger" may be demonstrated by establishing that: (1) the conduct that led to the criminal proceedings occurred, and (2) that there is a reasonable probability that such conduct will be repeated. Id. (citation omitted). "A petitioner need not prove that an insanity acquittee who had been charged with criminal homicide will actually kill again. It is sufficient to show a reasonable probability that some form of violent conduct will occur." Id. "'Probability' denotes a chance stronger than possibility but falling short of certainty." **Commonwealth v. Helms, 506 A.2d 1384, 1389 (Pa.Super.1986).** "The prior conduct of one who is mentally ill may be an indicator of future behavior." In Re: R.G., *supra,* at 519. "[I]nvolvement in such an extreme form of violence, while not dispositive, is one factor the hearing judge may consider in his evaluation of the appellant's continued dangerousness." Id. at 518 (citations omitted). Any lack of recent

10

evidence of actual violent conduct does not negate a finding of "clear and present danger and should be viewed in light of the fact that appellant has been confined to a mental hospital since the killing occurred." Helms, *supra*, at 1390. It is well documented that without anti-psychotic medication, a schizophrenic's risk of relapse into a psychotic state is greatly increased." Id. *citing* Davis, Overview: Maintenance Therapy in Psychiatry: Schizophrenia, Am.J. Psychiatry 132: 1237 (1975).

In the case of **In Re Glenn Watt, 525 A.2d 421 (Pa.Super.1987)**, the appellant was involuntarily committed to Fairview State Hospital following his acquittal of murder because of lack of criminal responsibility. He was recommitted on six occasions. In his appeal, Watt argued that the evidence was insufficient to support a finding that he was severely mentally disabled. He argued, specifically, the lack of clear and convincing evidence to establish that he posed a clear and present danger to anyone and he presented psychiatric testimony to that effect. The facts showed that Watt was still suffering from paranoid schizophrenia albeit in partial remission and that there was a significant risk that he would decompensate back into overt psychotic behavior if he were placed in a setting with less structure than that provided by a state hospital. Id. at 423. The Superior Court noted that it was for the factfinder to determine what testimony he determined more credible. Id. The Superior Court also stated, "...in the recommitment setting, the statute provides that 'it shall not be necessary to show recurrence of dangerous conduct either harmful or debilitating, within the past 30 days. Id.(citations omitted); 50 P.S. § 7304(a)(2).

### III.   CONCLUSION

In the case at bar, the Court found, by clear and convincing evidence, that

11

Appellant continues to pose a clear and present danger to himself or others. The conduct that led to the criminal proceedings is uncontested; Appellant murdered his wife by beating her to death with a blunt object, most likely, a kitchen chair. There is a reasonable probability that such conduct will be repeated. Appellant's schizophrenia may be in remission, but this is due to the structure of the hospital setting that ensures he take his psychotropic medication. WSH has been his home for over two decades. In fact, it has been more than his home; it is his whole world. Out in the community, by contrast, Appellant has no family he can turn to for support. His brother no longer talks to him and his children no longer speak to him; in fact, he does not even know where they are. Also, Appellant does not speak much English. If he were to be released to go to Philadelphia, where there is a large Korean population, he will be ostracized by that community once they learn of his past. Appellant still has a deep religious preoccupation, a factor that had a bearing on the murder of his wife. Considering these factors, the Court finds that, by clear and convincing evidence, without the structure of the hospital setting, there is a reasonable probability that Appellant will again become psychotic and pose a danger to himself or others.

Dr. Rotenberg outlined the only safe way for Appellant to be released from WSH, which would be into a half-way house or long-term residential treatment program, and then only very slowly, step by step, allowing Appellant to return to WSH, his safe haven, after each outing, to keep him in remission. Dr. Rotenberg urged extreme caution and vigilance because of the potential for Appellant to harm himself or others if the transition into less structure proves damaging to him.

It is in Appellant's best interest, and therefore the community's best interest, for

12

the doctors to carefully research less restrictive alternatives to Wernersville State Hospital and to cautiously implement Appellant's transition to a long-term residential treatment placement over the next year, if this could be possible.

For the foregoing reasons, we respectfully request that the Superior Court affirm the order of June 11, 2014.

BY THE COURT:

LINDA K.M. LUDGATE, S. J.

13