J-S32042-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: R.B. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: R.B. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 484 MDA 2022 |

Appeal from the Order Entered March 3, 2022
In the Court of Common Pleas of Berks County Civil Division at No(s):
50-2022-MH

BEFORE: PANELLA, P.J., BENDER, P.J.E., and LAZARUS, J.

MEMORANDUM BY LAZARUS, J.: **FILED: NOVEMBER 8, 2022**

R.B. appeals from the order, entered in the Court of Common Pleas of Berks County, affirming the certification for extended involuntary commitment under section 7303 of the Mental Health Procedures Act ("MHPA").[1] Upon careful review, we affirm.

R.B. was admitted to Brooke Glen Behavioral Hospital ("Brooke Glen") on February 24, 2022, pursuant to Brooke Glen's petition for involuntary mental health treatment under 50 P.S. § 7302. On February 25, 2022, a petition to extend R.B.'s court-ordered treatment by ten days was filed pursuant to 50 P.S. § 7303 ("Section 303"). On March 2, 2022, a section 303 hearing was held telephonically[2] before Mental Health Review Officer

---

[1] 50 P.S. §§ 7101-7503.

[2] An audio recording of the hearing has been made a part of the certified record on appeal.

("MHRO") Terry Weller, Esquire, at which R.B. was represented by court-appointed counsel, Andrew Scott, Esquire, of the Berks County Public Defender's Office.

At the hearing, R.B.'s treating psychiatrist, Daniela Krausz, M.D., testified that R.B. originally came to the emergency room because he was experiencing chest pains and felt as though he was unable to function. She testified that R.B. had been under a significant amount of stress since his house burned down and he was struggling to deal with his insurance company and contractors. At the time he was admitted to Brooke Glen, R.B. was not eating or sleeping enough, and was suffering from paranoid beliefs about being followed and investigated by his insurance company. Doctor Krausz diagnosed R.B. with psychosis NOS (not otherwise specified). She attempted to treat him with medication to help with his sleeping and his mood, but he refused. She stated that R.B. participated in group and other activities, but that staff was having difficulty engaging him. Doctor Krausz testified that R.B. was not aggressive or assaultive in his behavior, except "a little . . . at the beginning." MRHO Hearing, 3/2/22, at 7:47. Doctor Krausz testified that, at the time of the hearing, R.B. was sleeping a little better and eating "some," although he did not like the food available to him. She testified that R.B. still believed that he was being followed, had poor insight and limited judgment, and was a danger to himself due to his lack of self-care. Doctor Krausz opined that medicine would benefit R.B. by making him less paranoid, helping him sleep better, and decreasing his anxiety. Doctor Krausz ultimately opined that

Brooke Glen was the least restrictive facility for R.B. and recommended further treatment there of up to ten days.

R.B. testified that he had gone to the emergency room because he felt overwhelmed by his current situation—his house burned down in 2019 and, since then, he has been unsuccessfully trying to work with contractors, adjustors, and his insurance company to rebuild. He believed that, by going to the hospital, he could obtain a doctor's note and get time off from work to focus on dealing with his situation. He stated that he has been unable to sleep due to everything that is going on, as well as the fact that he and his family are being evicted from their apartment. He attributed his weight loss to a recent bout of COVID-19, which caused him to be out of work for two weeks.

Following the conclusion of the testimony, the MHRO stated that, while he was not "hearing a great deal," *id.* at 16:59, R.B.'s stressors remained, which concerned him. Accordingly, in the hope that Dr. Krausz could "get something set up for [R.B.]," *id.* at 17:05, the MHRO issued a certification finding that R.B. was severely mentally disabled and was in need of continued inpatient treatment for a period not to exceed five days.

On March 3, 2022, R.B. filed a petition for review of certification for extended involuntary commitment in the Court of Common Pleas pursuant to section 7109 of the MHPA. R.B. requested that the audio recording of the section 303 hearing be used in lieu of a formal *de novo* hearing. Upon review

J-S32042-22

of the recording, the trial court affirmed the extended involuntary certification on March 3, 2022.[3]

R.B. filed a timely notice of appeal, followed by a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. He raises the following claim for our review:[4]

> Whether [Brooke Glen] failed to present sufficient evidence to support the involuntary commitment of R.B. where R.B.'s treating psychiatrist could not articulate any clear or present danger [that] R.B. posed to himself or others and could not say that R.B. posed a substantial risk of serious bodily injury or death within thirty days in a less restrictive environment.

Brief of Appellant, at 4.

The standard of review for an involuntary commitment order under the MHPA is to "determine whether there is evidence in the record to justify the court's findings." *In re S.M.*, 176 A.3d 927, 935 (Pa. Super. 2017).

_____

[3] R.B. was ultimately discharged from treatment at Brooke Glen on March 4, 2022.

[4] Although R.B.'s commitment order has expired, his appeal is not moot.

> We recognize that an important liberty interest is at stake in all involuntary commitments and by their nature, most commitment orders expire prior to appellate review. Since a finding of mootness would allow such claims to go unchallenged in most, if not all, cases, we continue to hear these matters and, where the facts allow, we have authority to vacate a commitment order and direct that the record be expunged.

*In re R.D.*, 739 A.2d 548, 553 (Pa. Super. 1999) (citations omitted); *see also In re J.M.*, 726 A.2d 1041, 1045 n.6 (Pa. 1999) (holding appeals from expired involuntary commitment orders not moot as issues raised on appeal capable of repetition and may evade review). Accordingly, the appeal is properly before us.

- 4 -

"Although we must accept the trial court's findings of fact that have support in the record, we are not bound by its legal conclusions from those facts." ***Id.***

We have explained the involuntary commitment process under the MHPA as follows.

> The MHPA provides for involuntary emergency examination and treatment of persons who are "severally mentally disabled and in need of immediate treatment." 50 P.S. § 7301(a). It then authorizes increasingly long periods of commitment for such persons, balanced by increasing due process protections in recognition of the significant deprivations of liberty at stake. ***See In re A.J.N.***, 144 A.3d 130, 137 (Pa. Super. 2016) (highlighting MHPA's purpose as "an enlightened legislative endeavor to strike a balance between the state's valid interest in imposing and providing mental health treatment and the individual patient's rights"). Accordingly, "[i]n applying the [MHPA,] we must take a balanced approach and remain mindful of the patient's due process and liberty interests, while at the same time permitting the mental health system to provide proper treatment to those involuntarily committed to its care." ***In re S.L.W.***, 698 A.2d 90, 94 (Pa. Super. 1997).

***In re S.M.***, 176 A.3d at 930–31.

> Under subsection 301(a) of the MHPA:
>
> Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a *clear and present danger* of harm to others or to himself, as defined in subsection (b)[.]

50 P.S. § 7301(a). Subsection 301(b)(2) defines "clear and present danger" to oneself, in relevant part, as follows:

> Clear and present danger to himself shall be shown by establishing that within the past 30 days:

(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision[,] and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act[.]

*Id.* at § 7301(b)(2)(i). Section 302 provides for emergency examination and treatment of persons, which

may be undertaken at a treatment facility upon the certification of a physician stating the need for such examination; or upon a warrant issued by the county administrator authorizing such examination; or without a warrant upon application by a physician or other authorized person who has personally observed conduct showing the need for such examination.

*Id.* § 7302(a). Under subsection 302(b), a physician must examine the person "within two hours of arrival in order to determine if the person is severely mentally disabled within the meaning of [sub]section 301(b) and in need of immediate treatment." *Id.* at § 7302(b) (internal footnote omitted). If the physician so finds, then "treatment shall be begun immediately." *Id.* If not, then "the person shall be discharged and returned to such place as he may reasonably direct." *Id.* Section 302 allows a person to be committed up to 120 hours. *Id.* § 7302(d).

When a treatment "facility determines that the need for emergency treatment is likely to extend beyond 120 hours," or five days, section 303 provides that the facility may apply to extend the involuntary commitment for up to 20 days. *Id.* at § 7303(a), (h). The facility files an application for extended commitment with the court of common pleas, which then appoints

an attorney for the person unless it appears "that the person can afford, and desires to have, private representation." *Id.* at § 7303(b). "Within 24 hours after the application is filed, an informal hearing shall be conducted by a judge or [MHRO]." *Id.*

If the judge or MHRO certifies that an extended section 303 commitment is appropriate, the committed person may petition the court of common pleas for review of the certification. *Id.* at § 7303(g). The trial court must hold a hearing "within 72 hours after the petition is filed unless a continuance is requested by the person's counsel." *Id.* "The hearing shall include a review of the certification and such evidence as the court may receive or require." *Id.* "If the court determines that further involuntary treatment is necessary and that the procedures prescribed by the [MHPA] have been followed, it shall deny the petition. Otherwise, the person shall be discharged." *Id.*

The MHPA is to be strictly construed. *Commonwealth v. Moyer*, 595 A.2d 1177, 1179 (Pa. Super. 1991) (citation omitted).

> Recognizing the substantial curtailment of liberty inherent to an involuntary commitment, our Supreme Court has cautioned that the courts must strictly interpret and adhere to the statutory requirements for commitment. In interpreting section 301(b)(2)(i), this Court has held that a mere finding of senility is insufficient to establish that a person is a "clear and present danger" to himself. *See In re Remley*, [] 471 A.2d 514 ([Pa. Super.] 1984). Without evidence that the individual would die or suffer serious bodily injury or serious physical debilitation in the immediate future unless he was committed, the statutory requirement had not been met. Similarly, . . . it is not sufficient to find only that the person is in need of mental health services. The court must also establish that there is a reasonable probability

of death, serious injury[,] or serious physical debilitation to order commitment.

*In re T.T.*, 875 A.2d 1123, 1126–27 (Pa. Super. 2005).

The issue in this case is whether there was sufficient evidence to warrant R.B.'s continued involuntary treatment under section 303. "The burden is on the petitioner to prove the requisite statutory grounds by clear and convincing evidence." *In re S.M.*, 176 A.3d at 937 (citation and quotation marks omitted). "Our Supreme Court has defined clear and convincing evidence as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Id.* (citations and internal quotation marks omitted).

R.B. argues that Dr. Krausz could not testify that he posed a "clear and present danger to himself," Brief of Appellant, at 11, where she "could not say one way or the other if the rate at which R.B. was eating and sleeping would cause death or serious bodily injury within thirty days." *Id.* at 16. He notes that "Dr. Krausz did not testify that the amount R.B. was eating was not enough to sustain life." *Id.* at 17. R.B. argues that "Dr. Krausz's assertion that she did not have enough information to determine if [R.B.] would pose a risk to himself or others is clearly deficient, as it does not even qualify as speculation, let alone reasonable speculation." *Id.* at 17. R.B. asserts that, while he "could probably have benefitted from some sort of treatment and assistance[,] . . . this is not the purpose of the MHPA," which requires a finding

that he is a clear and present danger to himself before depriving him of his liberty. *Id.* at 18.

In support of his claim, R.B. relies on this Court's decision in *In re S.M.*, *supra*. There, S.M., who suffered from schizoaffective bipolar disorder, was committed primarily on the basis that she was not taking her medication in therapeutic doses, as she believed that her illness "was better treated through homeopathic remedies[.]" *Id.* at 938. Following her recommittal by an MHRO, S.M. filed an appeal *de novo* to the court of common pleas. The evidence showed that S.M. believed that "various hospital and state officials were conspiring and colluding with her mother to keep her involuntarily committed." *Id.* Testimony also revealed that S.M. had gone several days without eating, went several nights without sleep, and made racial slurs to other residents. *Id.* at 939. Although her treating psychiatrist testified that S.M.'s illness and unwillingness to properly take her medication affected her judgment, he did not testify that S.M. posed a danger to herself or that there was "a reasonable probability that death, serious bodily injury[,] or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded." *Id.* Instead, "the essence of his testimony was that S.M. would be better off taking her medications in therapeutic doses, and that the best way to ensure that she did so was through continued involuntary commitment." *Id.* The court of common pleas affirmed the MHRO's certification.

This Court reversed the order of the trial court, finding that the evidence did not show by clear and convincing evidence that S.M. posed a clear and present danger to herself, and noting that "the serious deprivations of liberty authorized by the MHPA demand that such deprivations be justified through strict compliance with statutes substantive and procedural requirements." *Id.*

R.B. argues that the evidence adduced at his MHRO hearing and reviewed by the trial court on *de novo* appeal was similar to that presented to the court in *In re S.M.* Specifically, like S.M., R.B. refused medication— although unlike S.M., he had never before been on medication—and both experienced disruptions in eating and sleeping habits. Likewise, both R.B. and S.M. had paranoid beliefs. However, R.B. argues that "[p]aranoia alone is not sufficient to involuntarily commit an individual under the MHPA without some sort of evidence that the person might act in such a way . . . that would place himself or others in danger, and that is not established here." Brief of Appellant, at 16. Moreover, Dr. Krausz acknowledged that R.B.'s sleep habits had improved—without medication—during the short time he had been hospitalized, and he argues that "his refusal to take medication[,] by itself[,] is not enough to establish that he poses a clear and present danger to himself." *Id.* at 15.

After our review of the record in this matter, we are constrained to conclude that the evidence was sufficient to support the trial court's affirmance of the MHRO's order extending R.B.'s involuntary commitment by five days. This case is, admittedly, a close call. The MHRO himself admitted that he had

"not hear[d] a great deal," but extended the commitment for 5 days in the hopes that Dr. Krausz could "get him set up with something as an outpatient or something with medication." MRHO Hearing, 3/2/22, at 16:59, 17:05. However, viewed in its totality, the evidence clearly and convincingly demonstrates that there is a reasonable probability that R.B. would suffer serious bodily injury or death within thirty days if untreated. We note that:

> in establishing the "clear and convincing" standard of proof for involuntary treatment:
>
>> Whether the individual is mentally ill and dangerous to [either himself or] others . . . turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists. . . .
>>
>> The subtleties and nuances of psychiatric diagnosis render certainties beyond reach in most situations. . . . Within the medical discipline, the traditional standard . . . is a "reasonable medical certainty[.]" [The] "beyond a reasonable doubt" standard would forc[e] reject[ion] [of] commitment for many patients desperately in need of institutionalized psychiatric care.

*Commonwealth v. Helms*, 506 A.2d 1384, 1389 (Pa. Super. 1986), quoting *Addington v. Texas*, 441 U.S. 418, 429–30 (1979) (citations omitted) (emphasis added). The legislature did not require indisputable proof that an individual's behavior would be repeated, but rather proof of the "probability" of such an event, which denotes "a chance stronger than possibility but falling short of certainty." *Helms*, 506 A.2d at 1389, quoting Webster's New World Dictionary, Coll. Ed. (1966). Thus, a petitioner must present evidence demonstrating a substantial likelihood that the behavior will recur if the

individual is not involuntarily committed. *Id.* We believe that standard has been met here.

Although Dr. Krausz could not say with absolute certainty that death or serious bodily injury would result within thirty days, the trial court deemed her testimony sufficient to find that R.B. posed a clear and present danger to himself in the absence of further treatment, as contemplated by the statute:

> Dr. Krausz testified that [R.B.] presented to the emergency department with "chest pains," which she believed were caused by "severe anxiety," as well as "allegations of some paranoid delusions" and that he was not sleeping or eating. Though Dr. Krausz testified that [R.B.] was participating in his unit's treatment schedule, including group therapy, she raised concerns regarding medication compliance upon release due to R.B. refusing any medication during his treatment. Further, in response to a question from the [MRHO], the doctor described [] R.B.'s insight and judgment as "poor," stating that these factors contributed to her concerns that he would pose a risk of harm or danger to himself due to lack of self-care. [Doctor] Krausz testified that Brooke Glen is the least restrictive facility for R.B. "because he has failed to fully engage in treatment," continues to hold paranoid beliefs about being followed, and refused all medication, which she believes is vital to helping [R.B.] feel "less paranoid, sleep better[,] and reduce the anxiety he has." Together these factors led Dr. Krausz to believe that, to the best of her knowledge, without continued inpatient care, R.B. would pose a substantial risk of serious bodily injury to himself in a less restrictive environment. She was unable to conclusively state whether this injury would happen within the thirty days prescribed by statute, but it was her belief that it would happen.

Trial Court Opinion, 4/26/22, at 2.

We find R.B.'s reliance on *In re S.M.* to be misplaced. While the facts there are similar to those in the matter *sub judice*, the Court in *In re S.M.* found the evidence supporting the commitment insufficient primarily because

the doctor "did not testify that S.M. posed a danger to herself or that there was 'a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded.'" ***In re S.M.***, 176 A.3d at 939. Conversely, here, Dr. Krausz testified that R.B.'s behavior would continue without further treatment and that he was a danger to himself because of his lack of self-care.

In sum, the record supports the trial court's factual findings, and we can discern no error of law. ***In re S.M.***, ***supra***. Doctor Krausz's testimony demonstrated that, without further treatment—including medication—R.B. would continue to pose a clear and present danger to himself through his lack of self-care, poor insight, and limited judgment, particularly where the stressors that caused the behavior continue to exist. ***See*** MRHO Hearing, 3/2/22, at 5:59 (Dr. Krausz testifying "what happened before is going to continue without addressing it—not sleeping, not eating"). Accordingly, we affirm the order of the trial court.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/8/2022