J-S26032-25

2025 PA Super 231

| | | |
|---|---|---|
| IN THE INTEREST OF: D.L.D. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: D.L.D. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 19 MDA 2025 |

Appeal from the Order Entered December 12, 2024
In the Court of Common Pleas of Centre County Civil Division at No(s):
2018-2865

BEFORE:  LAZARUS, P.J., OLSON, J., and BECK, J.

OPINION BY BECK, J.:                    **FILED: OCTOBER 10, 2025**

D.L.D. appeals from the order entered by the Centre County Court of Common Pleas ("trial court") denying his petition for review of certification for extending his involuntary outpatient mental health treatment pursuant to the Mental Health Procedures Act (MHPA).[1]  Finding that the County failed to satisfy its burden of proof that D.L.D. continued to be a clear and present danger of harm to himself or others, we reverse.

D.L.D., who suffers from schizophrenia, was initially committed for involuntary psychiatric treatment in July 2018 as a result of paranoid and delusional thinking, medication mismanagement, inappropriate behaviors, and poor insight into his mental health diagnoses.  At the time of his first 302 commitment,[2] he had not been eating, believing his food was contaminated

---

[1]  50 P.S. §§ 7101-7503, Act of Jul. 9, 1976, P.L. 817, as amended.

[2]  50 P.S. § 7302.

and poisoned. It was reported that he had little family support[3] and was determined to require inpatient hospitalization to stabilize his psychotic symptoms.

Since his initial commitment, D.L.D. has been repeatedly committed to undergo involuntary inpatient or outpatient psychiatric treatment for long periods of time. D.L.D. has a lengthy history of noncompliance with his prescribed medications, which has exacerbated his psychosis.[4]

Relevant herein, the record reflects that on September 22, 2023, D.L.D. was involuntarily committed to inpatient mental health treatment for a period not to exceed ninety days based upon a finding that he was a clear and present danger to himself and in need of immediate treatment. *See* 50 P.S. §§ 7301(a), (b)(2)(i), 7304(b).[5] The petition filed in support of the request

---

[3] The record reflects the contrary, as all documentation and proceedings that occurred subsequently show D.L.D.'s parents to be very involved and supportive of their son's care.

[4] D.L.D. was involuntarily committed for inpatient psychiatric care in August 2018, July 2019 (which transitioned to involuntary outpatient treatment in August 2019), January 2020, and August 2020 (which transitioned to involuntary outpatient treatment in September 2020 and extended in November 2020). Each application noted his noncompliance with prescribed medications, paranoid thinking, and threatening and aggressive behaviors toward multiple individuals and businesses. He appealed the July 2019 and August 2020 inpatient commitments, and this Court affirmed. *See Interest of D.L.D.*, 1342 MDA 2019 (Pa. Super. Mar. 2, 2020) (non-precedential decision); *Interest of D.L.D.*, 256 A.3d 25 (Pa. Super. May 13, 2021) (non-precedential decision).

[5] D.L.D. had been brought in for involuntary emergency examination and treatment, authorized by a physician, on August 31, 2023. *See* 50 P.S. § 7302.

described him as refusing to take any medication, including for his diagnosis of schizophrenia. In the month leading up to his hospitalization, he was reportedly engaging in harassing and aggressive behaviors toward judges and other government officials, police officers, random individuals, and entities including "Crossroads Counseling, Penn State University, Nittany Properties, Happy Valley Adventures and Connections." Application for Extended Involuntary Treatment, 9/1/2023, Attachment A. Notably, on August 22, 2023, after D.L.D. refused to leave the office of Magisterial District Judge Steven Lachman, staff summoned police. While police interviewed him, D.L.D. ran into oncoming traffic, "zig zag[ging]" in the middle of the street. *Id.* Pursuant to the request, D.L.D. had fourteen police interactions over thirty days, and it was the conclusion of the petitioner that his "erratic[,] reckless[,] … aggressive, [and] angry" behaviors were the result of his "failure to treat his mental health condition[.]" *Id.*

On October 9, 2023, the County Administrator filed notice of the intent to discharge D.L.D. from inpatient treatment into involuntary outpatient treatment at Oasis Lifecare in State College. On December 11, 2023, the County sought a court order to extend D.L.D.'s involuntary outpatient treatment for a period not to exceed 180 days, which Mental Health Review Officer Sonja Napier, Esquire, granted on December 20, 2023; the trial court

accepted the recommendation on December 22, 2023.[6]  ***See*** 50 P.S. § 7305(c).  The County sought an additional 180-day extension of involuntary outpatient treatment on June 12, 2024, which was granted on June 20, 2024.

In the petition underlying this appeal, the County sought for D.L.D. to undergo an additional 180 days of involuntary outpatient mental health treatment on December 3, 2024.  The matter again proceeded to a hearing before Mental Health Review Officer Napier.

At the commitment hearing, one of D.L.D.'s treating physicians, Dr. Jason Rock, testified that he had been treating D.L.D. for more than two years and that D.L.D. had been diagnosed with schizophrenia, for which he is prescribed a monthly injection of Haloperidol, and anxiety, for which he receives Vistaril.  N.T., 12/9/2024, at 7-9, 13, 17.  Dr. Rock opined, to a reasonable degree of medical certainty, that D.L.D. was not able to care for his basic needs—his "health, safety, welfare and nutrition"—without the level of care he was receiving because of his "poor insight into his mental illness," his failure to take ownership of his illness, and his history of decompensating when released from commitment.  ***Id.*** at 9-10.  He stated that D.L.D. was ambivalent about his diagnosis and taking his medication, expressing that he thought treatment was "stupid shit."  ***Id.*** at 10 (emphasis omitted), 12-13.

---

[6]  A mental health review officer is similar to a master; in the circumstances in the case at bar, she makes recommendations that the trial court may, in its discretion, accept or reject.  ***Commonwealth v. Helms***, 506 A.2d 1384, 1386 (Pa. Super. 1986).

According to Dr. Rock, D.L.D.'s "cycle" in this regard was to "decompensate, be hospitalized, be placed on medication, come out and then stop the medications[,] and repeat." *Id.* He was of the view that this cycle would continue, resulting in him becoming a danger to himself and others, and again requiring hospitalization, incarceration, or both. *Id.* Dr. Rock believed that if the court discontinued D.L.D.'s involuntary outpatient treatment, there was "a reasonable probability of death, disability or serious physical debilitation[.]" *Id.* at 11.

Dr. Rock indicated that although he has had both positive and negative interactions with D.L.D., D.L.D. has consistently expressed "ambivalence or just outright disagreement with the fact that he has a mental health diagnosis, that he needs to take medications, and he views psychiatric care as a burden." *Id.* at 12. In the absence of court-ordered treatment, D.L.D. "would immediately stop the medication and decompensate as he's done before." *Id.* In the past, Dr. Rock stated D.L.D. has become psychotic when he stopped taking his medications; he stole and harassed people (including law enforcement officials); and according to Dr. Rock, he feared that in the wrong circumstances and conditions, this could result in harm to D.L.D. *Id.* at 17. Dr. Rock noted that D.L.D.'s symptoms would worsen within weeks of medication cessation. *Id.* at 18.

Dr. Rock was hopeful that D.L.D.'s insight could continue to improve with an extended period of court-ordered outpatient treatment. *Id.* at 14. He

acknowledged, though, that D.L.D. did not pose a threat to others and was doing very well—living independently, working, engaging with his family, and applying to law school. *Id.* at 11, 14.

D.L.D. testified at the hearing and stated that he planned to return to law school, having completed his first year at the University of Colorado, and then transferred to University of Minnesota. *Id.* at 25. When asked to address the concern about his noncompliance with his mental health treatment, he responded:

> As far as I'm concerned, it should be up to me. And as far as I'm concerned, I'm seeing --- I'm getting away from doctors that testify in court against me. I'm getting away from physician's assistant's [sic] that assist with the doctor that testify [sic] in court against me. And I'm going to see another doctor.

*Id.* at 26. He recognized his need for further treatment and testified that he will continue treatment with a physician of his choice, "[j]ust not these people who testify in court against me. I don't like that. That's not nice. It's not very nice at all. It's not very nice at all." *Id.* at 27. D.L.D. continued, testifying about his financial status and thanking his family and friends who were there supporting him. *Id.* at 27-29.

D.L.D.'s mother and father also testified. His mother shared that D.L.D. is more communicative with her than he was before he began treatment. *Id.* at 30-31. She stated that he has never threatened to harm himself or anyone else, she believed he would be able to continue treatment on his own, and that he has changed significantly throughout his course of treatment. *Id.* at

31-33. D.L.D.'s father likewise testified to the "dramatic change" he has seen in his son. *Id.* at 35. He stated D.L.D. should be permitted to choose his own doctor, someone "he feels comfortable with," as most everyone is allowed to do when determining their healthcare providers. *Id.* at 36-37. His best friend and his brother also testified to the improvements they have seen in D.L.D. over the years. *Id.* at 40, 42-43.

On December 10, 2024, Mental Health Review Officer Napier recommended finding that there was sufficient evidence for D.L.D.'s involuntary outpatient treatment to be extended for another 180 days. Subsequently, on December 12, 2024, based upon the petition and "other relevant matter[s]," including the recommendation of Mental Health Review Officer Napier, the trial court entered an order directing D.L.D. be committed to outpatient treatment for a period not to exceed 180 days. D.L.D filed a petition to review the certification for treatment pursuant to 50 P.S. § 7303(g), and subsequently, an amended petition. The trial court denied the amended petition. This timely appeal followed.[7]

D.L.D. raises the following issue for our review: "Did the [County] lack sufficient evidence to involuntarily commit appellant to involuntary psychiatric

---

[7] We note that although the 180-day period of involuntary commitment from the petition at issue has expired, the issue is not moot. *See In re S.M.*, 176 A.3d 927, 930 n.3 (Pa. Super. 2017) (explaining that even if the patient's period of involuntary commitment ended, the issues raised on appeal "are not moot since they are capable of repetition and may evade review") (citations omitted and formatting altered).

treatment as it failed to present clear and convincing evidence of conduct supporting a conclusion that death or serious physical debilitation or bodily injury were likely imminent if he were not forced to undergo treatment?" D.L.D.'s Brief at 4.

"In reviewing a court order for involuntary commitment, we must determine whether there is evidence in the record to justify the court's findings. Although we must accept the trial court's findings of fact that have support in the record, we are not bound by its legal conclusions from those facts." *In re S.O.*, 311 A.3d 1132, 1135 (Pa. Super. 2024) (citation and quotation marks omitted).

"The legislature enacted [the MHPA] to establish procedures to assure the availability of adequate treatment to persons who are mentally ill." *In re B.W.*, 250 A.3d 1163, 1165-66 (Pa. Super. 2021) (citation and quotation marks omitted). "The MHPA's provisions shall be interpreted in conformity with the principles of due process to make voluntary and involuntary treatment available where the need is great and its absence could result in serious harm to the mentally ill person or to others." *Id.* at 1166 (citation and quotation marks omitted). Therefore, "[i]n applying the [MHPA,] we must take a balanced approach and remain mindful of the patient's due process and liberty interests, while at the same time permitting the mental health system to provide proper treatment to those involuntarily committed to its care." *S.M.*, 176 A.3d at 931 (citation omitted).

The MHPA provides, in pertinent part:

Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself, as defined in subsection (b), or the person is determined to be in need of assisted outpatient treatment as defined in subsection (c).

50 P.S. § 7301(a). Of relevance here, the County establishes that a patient is a clear and present danger to himself if

the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act[.]

*Id.* § 7301(b)(2)(i).[8]

The MHPA sets forth the procedure for ordering an extension of a period of assisted outpatient treatment as follows:

At the expiration of a period of court-ordered involuntary treatment under section [7]304(g) or this section, the court may order treatment for an additional period upon the application of the county administrator or the director of the facility in which the person is receiving treatment. Such order shall be entered upon hearing on findings as required by sections [7]304(a) and (b), and

_____

[8] A finding that a person presents a clear and present danger typically requires proof that the conduct in question occurred within the past thirty days. 50 P.S. § 7301(b)(2). Where, as here, the County is seeking to extend the period of involuntary commitment pursuant to section 7305(a), the MHPA provides that "it shall not be necessary to show the reoccurrence of dangerous conduct, either harmful or debilitating, within the past 30 days." *Id.* § 7304(a)(2).

the further finding of a need for continuing involuntary treatment as shown by conduct during the person's most recent period of court-ordered treatment. The additional period of involuntary treatment shall not exceed 180 days; provided that persons meeting the criteria of section [7]304(g)(2) may be subject to an additional period of up to one year of involuntary treatment.

*Id.* § 7305(a) (footnote omitted). Section 7304, in turn, provides, in relevant part:

Where a petition is filed for a person already subject to involuntary treatment, it shall be sufficient to represent, and upon hearing to reestablish, that the conduct originally required by section [7]301(b) in fact occurred, and that his condition continues to evidence a clear and present danger to himself or others, or that the conduct originally required by section [7]301(c) in fact occurred and that his condition continues to evidence a need for assisted outpatient treatment.

*Id.* § 7304(a)(2).

We have previously summarized the proof required to extend an involuntary commitment thusly:

The Act specifically states that on recommitment it is not necessary to show that the patient committed an overt act within 30 days of the hearing. It is necessary[,] however[,] for the court to find that within the patient's most recent period of institutionalization, the patient's conduct demonstrated the need for continuing involuntary treatment, ... i.e.[,] his condition continues to evidence a clear and present danger to himself[.]

*S.M.*, 176 A.3d at 938 (citation omitted); *see also supra* note 8. "The burden is on the petitioner to prove the requisite statutory grounds by clear and convincing evidence." *S.M.*, 176 A.3d at 937 (citation and quotation marks omitted); *see also* 50 P.S. § 7301(c)(1). "Clear and convincing evidence is testimony that is so clear, direct, weighty, and convincing as to enable the

- 10 -

trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." **S.M.**, 176 A.3d at 937 (citation omitted). "[T]he clear and convincing evidence test has been described as an intermediate test, which is more exacting than a preponderance of the evidence test, but less exacting than proof beyond a reasonable doubt." **Id.** (citation and quotation marks omitted).

D.L.D. argues that the evidence presented at the mental health review "was insufficient to compel [him] to undergo involuntary psychiatric treatment." D.L.D.'s Brief at 11. He contends that the evidence does not show he continues to be a clear and present danger to himself because the County failed to establish that he could die or be seriously injured within thirty days of being released from involuntary treatment. **Id.** at 16. He notes that his medication is injected every twenty-eight days and decomposition happens within weeks after a missed dose. **Id.** He further asserts that his past acts of theft, trespass, and harassment that occurred as a result of being unmedicated were "annoyances and petty criminal behaviors that do not rise to the level required by the [MHPA]," and there are no indications that he was violent towards himself or others when unmedicated. **Id.** at 16, 17. In his view, the decision to recommit him to involuntary outpatient treatment was based on pure speculation of what could occur if he is discharged. **Id.** at 15, 17.

The trial court found as follows:

[T]he record reflects that D.L.D. has a history of threatening behavior when he is not compliant with his behavioral health treatment and medications. Notably, D.L.D. has displayed "constant, erratic, harassing, threatening behaviors toward a wide array of businesses, medical practices, law enforcement agencies, government agencies, individuals, etc." He committed these threatening behaviors face-to-face, over the phone, and via electronic communication. In 2023, D.L.D. was served with multiple trespass notices for his problematic behaviors and communications. D.L.D.'s history thus indicates that he suffers from conditions that would likely result in substantial risk of serious harm to himself or others, especially when he ceases his medication, which is likely to occur absent mandated outpatient treatment. The record also indicates that D.L.D.'s current employment presents a particular concern given his history of threatening behaviors and communications. D.L.D. currently works providing in-home personal care to older adults. Indeed, D.L.D. recently reported to the Centre County MH/ID/EI-D&A Office that he was working with a 90-year[-]old male. The [trial c]ourt finds that the populus D.L.D. works with is highly concerning given his history of threatening behavior and communications, and that without mandated outpatient treatment, there is a substantial risk of serious harm to others.

… D.L.D. suggests that the petitioner "failed to present clear and convincing evidence of conduct supporting a conclusion that death or serious physical debilitation or bodily injury were likely imminent if he were not forced to undergo involuntary treatment." This assertion is contrary to Dr. Rock's testimony that D.L.D. is unlikely to be able to provide for his own basic needs and that there would be a reasonable probability of disability within thirty (30) days absent continued outpatient treatment. The subject [o]rder is entered on the basis that D.L.D. is determined to need assisted outpatient treatment as defined in [s]ection [7]301(c) of the MHPA. Furthermore, [s]ection [7]304(a)(2) of the MHPA makes clear that where, as here, a petition is filed for a person already subject to involuntary treatment, "it shall be sufficient to represent, and upon hearing to reestablish … that the conduct originally required by section [7]301(c) in fact occurred and that his conditions continue to evidence a need for assisted outpatient treatment. In such event it shall not be necessary to show the reoccurrence of dangerous conduct, either harmful or debilitating, within the past 30 days."

Based on the testimony presented at the [p]etition [h]earing, the information set forth in the [p]etition for [e]xtended [i]nvoluntary [t]reatment, and the entire record of this case, the [trial c]ourt properly concluded that clear and convincing evidence exists that D.L.D. needs continued assisted outpatient treatment. The evidence confirms that D.L.D. is unlikely to safely survive in the community without supervision, that he has a history of lack of voluntary adherence to his treatment for mental illness, that he is unlikely to voluntarily adhere to his mental health treatment in the future, and that he needs treatment to prevent a relapse or deterioration that would be likely to result in substantial risk of serious harm to himself or others. Th[e trial c]ourt was correct in entering its December 1[2], 2024[] [o]rder committing D.L.D. to involuntary outpatient treatment, as the additional period of court-ordered involuntary treatment was proper under 50 P.S. § 7305.

Trial Court Opinion, 1/27/2025, at 7-9 (citations omitted).

As a preliminary matter, we note that the trial court was operating under the mistaken understanding that D.L.D. was committed to undergo assisted outpatient treatment and not involuntary outpatient treatment. While assisted outpatient treatment is also involuntary, it is a term of art with a distinct meaning from involuntary outpatient treatment, defined under the MHPA as:

Community-based outpatient social, medical and behavioral health treatment services ordered by a court for a severely mentally disabled person, which may include one or more of the following services:

(1) Community psychiatric supportive treatment.

(2) Assertive community treatment.

(3) Medications.

(4) Individual or group therapy.

(5) Peer support services.

- 13 -

(6) Financial services.

(7) Housing or supervised living services.

(8) Alcohol or substance abuse treatments when the treatment is a co-occurring condition for a person with a primary diagnosis of mental health illness.

(9) Any other service prescribed to treat the person's mental illness that either assists the person in living and functioning in the community or helps to prevent a relapse or a deterioration of the person's condition that would be likely to result in a substantial risk of serious harm to the person or others.

50 P.S. § 7103.1. The General Assembly added provisions concerning assisted outpatient treatment to the MHPA effective April 22, 2019, creating a lower threshold for the provision of a more flexible form of involuntary mental health care. **_See_** Act of Oct. 24, 2018, P.L. 690, No. 106; **_see also_** 50 P.S. § 7301(c).[9] The MHPA expressly allows counties to opt out of implementing

---

[9] The determination of the need for assisted outpatient treatment under section 7301(c) is made as follows:

(1) The need for assisted outpatient treatment shall be shown by establishing by clear and convincing evidence that the person would benefit from assisted outpatient treatment as manifested by evidence of behavior that indicates all of the following:

(i) The person is unlikely to survive safely in the community without supervision, based on a clinical determination.

(ii) The person has a history of lack of voluntary adherence to treatment for mental illness and one of the following applies:

(A)    Within the 12 months prior to the filing of a petition seeking assisted outpatient treatment, the person's failure to adhere to treatment has been a significant factor in necessitating involuntary inpatient hospitalization or receipt of services in a forensic or other mental health unit of a correctional facility, provided that the 12-month period shall be extended by the length of any hospitalization or

assisted outpatient treatment on an annual basis. 50 P.S. § 7177(a)(1). The record reflects that as of the hearing underlying this appeal, Centre County had not implemented assisted outpatient treatment, and D.L.D.'s continued care was premised upon the County's contention that presented a clear and

---

incarceration of the person in a correctional institution that occurred within the 12-month period.

(B) Within the 48 months prior to the filing of a petition seeking court-ordered assisted outpatient treatment, the person's failure to adhere to treatment resulted in one or more acts of serious violent behavior toward others or himself or threats of, or attempts at, serious physical harm to others or himself, provided that the 48-month period shall be extended by the length of any hospitalization or incarceration of the person in a correctional institution that occurred within the 48-month period.

(iii) The person, as a result of the person's mental illness, is unlikely to voluntarily participate in necessary treatment and the person previously has been offered voluntary treatment services but has not accepted or has refused to participate on a sustained basis in voluntary treatment, provided that voluntary agreement to enter into services by a person during the pendency of a petition for assisted outpatient treatment shall not preclude the court from ordering assisted outpatient treatment for that person if reasonable evidence exists to believe that the person is unlikely to make a voluntary sustained commitment to and remain in a treatment program.

(iv) Based on the person's treatment history and current behavior, the person is in need of treatment in order to prevent a relapse or deterioration that would be likely to result in substantial risk of serious harm to others or himself.

(2) An individual who meets only the criteria described in clause (1) shall not be subject to involuntary inpatient hospitalization unless a separate determination is made that the individual poses a clear and present danger in accordance with subsection (b).

50 P.S. § 7301(c).

present danger to himself or others. **See** N.T., 12/9/2024, at 18-22; **see also** Application for Extension of Involuntary Treatment, 12/3/2024.

As such, the trial court incorrectly based its decision, in part, upon the factors for determining a patient's need for assisted outpatient treatment in section 7301(c). **See** 50 P.S. § 7301(c). Nonetheless, the trial court made the requisite factual findings under section 7301(b) as well, and the question of whether clear and convincing evidence was presented to establish D.L.D. continued to be a clear and present danger is one of law. Thus, remand is not necessary.

As both D.L.D. and the County recognize, the issue before this Court is whether the County presented sufficient evidence to establish the need for his continued commitment under 7301(b). **See** 50 P.S. §§ 7304(a)(2), 7305(a). This requires a finding that (1) the conduct originally alleged under section 7301(b) actually occurred, and (2) D.L.D.'s condition continues to evidence a clear and present danger to himself or others. **Id.** § 7304(a)(2); **S.M.**, 176 A.3d at 936; **see also** 50 P.S. § 7301(b). D.L.D. does not raise any challenge as to whether his conduct necessitated his prior commitment. **See** D.L.D.'s Brief at 14-17. Accordingly, we direct our analysis to whether his condition continues to evidence that he is a clear and present danger to himself under section 7301(b)(2)(i).[10] It requires proof by clear and convincing evidence of

---

[10] As the County concedes, there was no testimony presented to support a finding that D.L.D. currently poses a danger to others. County's Brief at 3.

- 16 -

two elements: (1) that D.L.D. will be unable to provide for his own nourishment, housing, personal or medical care, or safety and self-protection without continued care, supervision, and continued assistance, and (2) there is a reasonable probability that D.L.D. will die, sustain serious bodily injury or serious physical debilitation within thirty days if involuntary outpatient treatment was discontinued. **See** 50 P.S. § 7301(b)(2)(i).

The record reflects that the concern repeatedly expressed by mental health professionals relates to D.L.D.'s continued unwillingness to take his prescribed medications without court-ordered treatment. Dr. Rock explained that when he does not take his medications, he decompensates quickly—within weeks of cessation—requiring his hospitalization or resulting in his arrest (or both). N.T., 12/9/2024, at 10. As of his most recent commitment, D.L.D. continued to express to the mental health professionals responsible for his care "ambivalence" about not only taking medication, but that he has a psychiatric diagnosis at all, believing he did not need treatment. **Id.** at 10, 12. On this basis, Dr. Rock testified that D.L.D. was incapable of providing for his health, safety, medical care, and welfare without the care and assistance he is currently receiving. **Id.** at 9. The record thus supports the trial court's finding that the County presented sufficient evidence to satisfy the first prong.

---

To the contrary, Dr. Rock specifically testified that D.L.D. was not a danger to others. N.T., 12/9/2024, at 11, 14.

- 17 -

As to the second prong, in response to a leading question by the County's attorney, Dr. Rock agreed that, within thirty days of discontinuing involuntary treatment, there was a reasonable probability of D.L.D.'s death, disability, or physical debilitation. *Id.* at 11. When asked on cross-examination to expound upon that conclusion, Dr. Rock testified that it was

> [b]ased on his past behaviors, [when] he has not been taking medication. He has become psychotic. He's done illegal things. He's stolen, he's trespassed, he's harassed people, including the police, with phone calls. And I just think that, you know, in this day and age, if he were to present as psychotic and unruly in the right circumstance, that he could be harmed.

*Id.* at 16-17. We must determine whether this constitutes a "reasonable probability" that death, serious injury, or physical debilitation will occur within thirty days of D.L.D.'s release from involuntary treatment.

We first construed this phrase in another context in **Helms**.[11] There, we began by recognizing the need to balance the liberty interests associated with the requirement of involuntary mental health treatment with the concomitant need to protect the patient and the public from harm resulting from his mental illness:

> We note that the purpose of the Act and the constitutional concerns it was meant to address indicate that reasonable probability cannot be equated with absolute certainty. Involuntary civil commitment of the mentally ill unquestionably constitutes a deprivation of liberty and may be accomplished only in accordance with due process protections. **Addington v.**

---

[11] In **Helms**, the Court considered the question of what constituted "a 'reasonable probability' that the conduct which gave rise to an insanity acquittee's involvement in criminal proceedings will recur." **Helms**, 506 A.2d at 1388; **see also** 50 P.S. § 7301(b)(1).

***Texas****,* 441 U.S. 418[] (1979); ***In re Hutchinson****,* [] 454 A.2d 1008 ([Pa.] 1982). Accordingly, the petitioner in an involuntary commitment proceeding must prove the requisite statutory grounds by clear and convincing evidence. 50 P.S. § 7304(f), *construed in* ***Commonwealth v. Hubert****,* [] 430 A.2d 1160 ([Pa.] 1981).

Nonetheless, under the Act the individual's liberty interests are not absolute. Rather, the Act attempts to strike a balance between the state's valid interest in imposing and providing mental health treatment and the individual patient's rights. ***Hutchinson****,* [] 454 A.2d at 1010. As the Legislature itself stated:

> The provisions of this act shall be interpreted in conformity with the principles of due process to make ... involuntary treatment available where the need is great and its absence could result in serious harm to the mentally ill person or to others.

50 P.S. § 7102.

***Helms****,* 506 A.2d at 1388-89.

The Court continued, considering the plain meaning of the word "reasonable," which "underscores the impossibility of demanding total accuracy." ***Id.*** at 1389. It further noted the ***Addington*** Court's recognition that "[t]he subtleties and nuances of psychiatric diagnosis render certainties beyond reach in most situations," requiring only that psychiatric experts testify with "reasonable medical certainty" to ensure those in need of mental health care received it. ***Id.*** at 1389 (quoting ***Addington****,* 441 U.S. at 429–30). It then considered the meaning of the word "probability," which, according to the dictionary definition, "denotes a chance stronger than possibility but falling short of certainty." ***Id.*** The ***Helms*** Court thus concluded that a "reasonable probability" under the MHPA requires the County to present

clear and convincing evidence of a "substantial likelihood"; "[m]ere speculation or conjecture" that the harm "could conceivably" occur is insufficient to "constitute a reasonable probability." **_Id._**

With this in mind, we are constrained to disagree with the trial court that the evidence presented clearly and convincingly showed that D.L.D.'s behaviors during his most recent commitment reflects that in the absence of continued involuntary outpatient treatment, there was a reasonable probability that D.L.D. would suffer death, serious bodily injury or physical debilitation within thirty days of his release from care. Dr. Rock testified to his concern that D.L.D. would, once again, discontinue his medications and become psychotic, and that D.L.D. "could" be harmed if he presented as "psychotic and unruly, in right circumstance." N.T., 12/9/2024, at 16-17. His basis for concluding that D.L.D.'s behaviors during his most recent commitment reflect a high likelihood that he will discontinue his medications and become psychotic has ample support in the record. However, neither Dr. Rock nor any other witness testified as to a "substantial likelihood" or even a "stronger chance than a possibility" that this would result in the statutory harms befalling D.L.D. Dr. Rock's testimony on this question was, at best, speculative that harm "could conceivably" occur. **_See Helms_**, 506 A.2d at 1389; 50 P.S. § 7301(b)(2)(i).

As we have repeatedly stated, the requirements for involuntary treatment under the MHPA are narrowly drawn and must be strictly construed.

*See Commonwealth v. Blaker*, 446 A.2d 976, 978 (Pa. Super. 1981); *see also S.M.*, 176 A.3d at 939 ("While we appreciate the challenges posed to the effective treatment of persons with long histories of serious mental illness, the serious deprivations of liberty authorized by the MHPA demand that such deprivations be justified through strict compliance with statute's substantive and procedural requirements."); *In re T.T*, 875 A.2d 1123, 1126-27 (Pa. Super. 2005) ("for involuntary commitment, it is not sufficient to find only that the person is in need of mental health services[, but] that there is a reasonable probability of death, serious injury or serious physical debilitation to order commitment") (citation omitted); *In re Remley*, 471 A.2d 514, 517 (Pa. Super. 1984) ("The courts, in overseeing such liberty-depriving bureaucratic action, must be especially protective of the rights of the individual and vigilant in ensuring that the legal safeguards have been complied with."). Based on the foregoing, we conclude that the trial court erred in denying D.L.D.'s petition for review of the certification extending his involuntary commitment under section 7305 of the MHPA. We therefore reverse the order extending D.L.D.'s involuntary commitment under section 7305.[12]

Order reversed. Jurisdiction relinquished.

---

[12] Like the *S.M.* Court, we observe that "[o]ur ruling … does not preclude the County from filing a new petition for involuntary commitment, at which time the County may present appropriate evidence supporting involuntary commitment under the MHPA." *S.M.*, 176 A.3d at 939 n.12.

President Judge Lazarus joins the opinion.

Judge Olson files a dissenting opinion.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary


Date: 10/10/2025