2025 PA Super 231

| | | |
|---|---|---|
| IN THE INTEREST OF: D.L.D. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: D.L.D. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 19 MDA 2025 |

Appeal from the Order Entered December 12, 2024
In the Court of Common Pleas of Centre County Civil Division at No(s):
2018-2865

BEFORE:  LAZARUS, P.J., OLSON, J., and BECK, J.

DISSENTING OPINION BY OLSON, J.:                **FILED: OCTOBER 10, 2025**

George Santayana, a Spanish-American philosopher, wrote in 1905, "Those who cannot remember the past are condemned to repeat it." In other words, failure to gain insight from past events can lead one down a path of repetition, perpetuating the same consequences. By reversing the trial court's order extending D.L.D.'s involuntary outpatient mental health treatment, I believe that the learned Majority is ignoring the extensive history of events involving D.L.D. thereby condemning the past to be repeated. I must, therefore, respectfully dissent.

D.L.D. suffers from schizophrenia and he was first committed for involuntary psychiatric treatment in July 2018. As noted by the Majority, "[s]ince his initial commitment, D.L.D. has been repeatedly committed to undergo involuntary inpatient or outpatient psychiatric treatment for long periods of time. D.L.D. has a lengthy history of noncompliance with his

prescribed medications, which has exacerbated his psychosis". Majority Opinion at 2. Specifically, as described in detail by the Majority, when D.L.D. is not properly medicated, he experiences paranoid thinking and engages in threatening and aggressive behavior toward himself and others. *Id.* at 2-4.

On December 3, 2024, the County filed a petition under the Mental Health Procedures Act ("MHPA") seeking an order directing D.L.D. to undergo an additional 180 days of involuntary outpatient mental health treatment. Following a hearing before Sonja Napier, Esquire, a Mental Health Review Officer, Review Officer Napier found sufficient evidence for D.L.D.'s involuntary outpatient treatment to be extended for another 180 days. On December 12, the trial court entered an order extending D.L.D.'s outpatient treatment for a period not to exceed 180 days. D.L.D. filed a petition to review the certification for treatment with the trial court which was denied.

My learned colleagues set forth in detail the provisions of the MHPA which are relevant herein and I will not repeat them. *See* Majority Opinion at 8-11. I merely reiterate that the issue before this Court is whether the County presented sufficient evidence to establish the need for D.L.D.'s continued commitment under the MHPA. As the Majority noted, "This requires a finding that (1) the conduct originally alleged under section 7301(b) actually occurred, and (2) D.L.D.'s condition continues to evidence a clear and present danger to himself or others." *Id.* at 16 (citations omitted). Additionally, as noted by my colleagues, D.L.D. does not challenge the sufficiency of the

- 2 -

evidence as to the first prong; thus we examine the record to determine whether the evidence is sufficient to establish that D.L.D. is a clear and present danger to himself which "requires proof by clear and convincing evidence of two elements: (1) that D.L.D. will be unable to provide for his own nourishment, housing, personal or medical care, or safety and self-protection without continued care, supervision, and continued assistance, and (2) there is a reasonable probability that D.L.D. will die, sustain serious bodily injury or serious physical debilitation within [30] days if involuntary outpatient treatment was discontinued". ***Id.*** at 16-17 (citations omitted). Moreover, I agree with the Majority that the County presented sufficient evidence to satisfy the first element; hence, we must focus on whether the record is sufficient to prove by clear and convincing evidence that there is a reasonable probability that death, serious bodily injury or serious physical debilitation will ensue within 30 days unless D.L.D. is provided adequate treatment. In carefully reviewing the record, I conclude that the evidence is sufficient to establish the second element. Thus, I believe that the trial court was correct in ordering D.L.D. to undergo involuntary outpatient treatment for a period not to exceed 180 days.

In reviewing the sufficiency of evidence to support an involuntary commitment under the MHPA, we review "the facts of record ***in the light most favorable to the original decision-maker*** to determine whether the requisite standard of proof has been met. ***In this case, the original***

*decision-maker was the review officer"*. *Interest of J.W.S.*, 284 A.3d 889 (Pa. Super. 2022) (non-precedential opinion) (citations and corrections omitted) (emphasis added).[1]  In setting forth this standard, the *J.W.S.* Court cited to our Supreme Court's decision in *In re Vencil*, 152 A.3d 235 (Pa. 2017).  Although *Vencil* dealt with the expunction of an individual's commitment records, the Supreme Court analyzed the phrase "sufficiency of the evidence" as applied in a case brought under the MHPA.  The Court held,

> the phrase "sufficiency of the evidence" is a term of art that has a precise meaning. … In other legal contexts, both state and federal, a challenge to the sufficiency of the evidence presents a pure question of law, *requiring review of the facts of record in the light most favorable to the original decision-maker or prevailing party* (if applicable) to determine whether the requisite standard of proof has been met.

*Id.* at 242-243 (emphasis added).  The *Vencil* Court continued:

> *Deference to the facts as found by the original factfinder is of particular importance in circumstances where the factfinders have specialized training or knowledge that makes them uniquely qualified to reach the findings and conclusions the General Assembly has entrusted them to make*.

*Id.* at 243.  In this case, the original decision-maker was Review Officer Napier.  Hence, we must view the facts of record in a light most favorable to Review Officer Napier who initially determined that the petition for an extension of D.L.D.'s involuntary outpatient treatment be granted.

---

[1] *See* Pa.R.A.P. 126(b) (unpublished non-precedential decisions of the Superior Court filed after May 1, 2019 may be cited for their persuasive value).

At the mental health review hearing held on December 9, 2024, Dr. Jason Rock, the psychiatrist who had been treating D.L.D. "for a few years" testified that D.L.D. has "poor insight into his mental illness [*i.e.*, schizophrenia]. … It seems as if the cycle that he goes through historically is that he will decompensate, be hospitalized, be placed on medication, come out and then stop the medications and repeat." N.T., 6/9/24, at 8, 9-10. Dr. Rock went on to state "my fear is that without the medication, the following up with psychiatrists and therapists and case management, ***that within 30 days or less that he will quickly stop taking his medication, decompensate and become a danger to himself and others and require hospitalization or jail time or both*." *Id.* at 10 (emphasis added). He went on to conclude within a reasonable degree of medical certainty that there would be a reasonable probability of death, disability or serious physical debilitation if D.L.D. were not receiving the recommended treatment. *Id.* at 11, 16.

Dr. Rock acknowledged that, at the time of the hearing, D.L.D. was currently compliant with his treatment and, therefore, not a danger to himself or others. *Id.* at 11. However, his concern about D.L.D.'s safety was based upon "his history". Dr. Rock explained:

> ***But throughout***, whether [D.L.D.'s] pleasant or not, he articulates ambivalence or just outright disagreement with the fact that he has a mental health diagnosis, that he needs to take medications, and he views psychiatric care as a burden. And so ***I believe that if this weren't forced upon him from a court ordered perspective treatment, that he would immediately***

> ***stop the medication and decompensate as he's done before.***

*Id.* at 12 (emphasis added).

On cross-examination, Dr. Rock testified that D.L.D. receives his medication via injection every 28 days and that his last injection was approximately one week before the hearing. *Id.* at 17. Counsel for D.L.D. then asked "[h]ow quick[ly] does [D.L.D.] decompensate if he missed his next injection?" to which Dr. Rock responded, "I'd hate to find out, but I'm prepared to say that if he did get [the injection] last week, …, 30 days from now would put him very much so at risk of decompensating and having that level of deterioration." Counsel then asked "[f]om your past experience, how quick is the decompensation?" Dr. Rock answered "[i]t's within a matter of weeks." *Id.* at 18.

During his own testimony, D.L.D. was asked by his counsel, "They're afraid if you're not committed, you'll stop taking the medication. What's your position on that?" In response, D.L.D. stated, "[a]s far as I'm concerned, ***it should be up to me.***" *Id.* at 26. In my view, D.L.D.'s statement that it should be up to him to decide whether to take medication and see doctors lends support to Dr. Rock's opinion that D.L.D. "articulates ambivalence or just outright disagreement" with the fact that he has a serious mental diagnosis and **must** take medications and that, if left to his own devices, D.L.D. would not obtain the necessary treatment, decompensate, and

deteriorate within 30 days resulting in a reasonable probability that he would die, sustain serious bodily injury or serious physical debilitation.

My learned colleagues acknowledge that there is "ample support" in the record that "D.L.D.'s behaviors during his most recent commitment reflect a high likelihood that he will discontinue his medications and become psychotic". Majority Opinion at 20. However, they believe that the evidence fails to establish a "substantial likelihood" or a "stronger chance than a possibility" that this would result in the statutorily required harm to D.L.D. Hence, they conclude that Dr. Rock's testimony was "at best, speculative that harm 'could conceivably' occur." *Id.*

I agree that we cannot determine with absolute certainty that D.L.D. will be at risk of death, serious bodily injury or serious physical debilitation if involuntary outpatient treatment is not ordered. I also agree that, if Dr. Rock had only recently begun caring for D.L.D. and was not familiar with his mental health history, Dr. Rock's conclusions would be "at best, speculative". However, the evidence clearly and convincingly establishes that Dr. Rock has a lengthy history with D.L.D. and is acutely aware of the fact that D.L.D. does not acknowledge his serious mental illness, and, unless involuntary outpatient treatment is ordered, he will refuse to take the medication and pursue the treatments that he absolutely needs to address his illness. The evidence also establishes that, when he is in a psychotic state, D.L.D. risks death, serious bodily injury or serious physical debilitation. As noted by the Majority, when

not treated, D.L.D.'s illness resulted in him believing his food was contaminated and, therefore, he would not eat; he exhibited threatening and aggressive behaviors toward businesses and individuals, including judges, government officials, and police officers; and he ran into oncoming traffic in the middle of the street. In my view, these actions which occurred when not receiving treatment, are actions that put D.L.D. at risk of death, serious bodily injury or serious physical debilitation. As the old adage goes, "The best predictor of future behavior is past behavior". D.L.D.'s past behavior predicts that, without involuntary outpatient treatment, there is a substantial likelihood that he will devolve into a psychotic state within weeks resulting in serious harm.

Based upon our standard of review and the evidence of record, I would affirm the trial court's order directing D.L.D. be committed to involuntary outpatient treatment for a period not to exceed 180 days.